# Exhibit 1



US009147085B2

(12) **United States Patent**
Bender et al.

(10) **Patent No.:** **US 9,147,085 B2**
(45) **Date of Patent:** **Sep. 29, 2015**

(54) **METHOD FOR ESTABLISHING A PLURALITY OF MODES OF OPERATION ON A MOBILE DEVICE**

(75) Inventors: **Christopher Lyle Bender**, Waterloo (CA); **Herbert Anthony Little**, Waterloo (CA); **Michael Kenneth Brown**, Fergus (CA); **Michael Stephen Brown**, Kitchener (CA)

(73) Assignee: **BlackBerry Limited**, Waterloo (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/098,456**

(22) Filed: **Apr. 30, 2011**

(65) **Prior Publication Data**

US 2012/0079609 A1     Mar. 29, 2012

**Related U.S. Application Data**

(60) Provisional application No. 61/386,270, filed on Sep. 24, 2010.

(51) **Int. Cl.**
| | |
|---|---|
| *G06F 21/62* | (2013.01) |
| *G06F 21/60* | (2013.01) |
| *H04W 12/08* | (2009.01) |
| *G06F 21/12* | (2013.01) |
| *G06F 21/53* | (2013.01) |
| *H04W 88/02* | (2009.01) |

(52) **U.S. Cl.**
CPC ............. *G06F 21/629* (2013.01); *H04W 12/08* (2013.01); *G06F 21/121* (2013.01); *G06F 21/53* (2013.01); *G06F 21/60* (2013.01); *H04W 88/02* (2013.01)

(58) **Field of Classification Search**
CPC ..... G06F 21/121; G06F 21/53; G06F 21/629; G06F 21/60; G06F 21/62
USPC ......................................................... 726/30
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,945,556 A | 7/1990 | Namekawa | |
| 5,864,765 A | 1/1999 | Barvesten | |
| 5,987,440 A | 11/1999 | O'Neil et al. | |
| 5,987,611 A | 11/1999 | Freund | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101523878 A | 9/2009 |
| EP | 0973350 A1 | 1/2000 |

(Continued)

OTHER PUBLICATIONS

Shabrai, et al., Google Andriod: A comprehensive Security Assessment, Mar./Apr. 2010, IEEE Computer and Reliability Societies, IEEE Security & Privacy, pp. 35-44.*

(Continued)

*Primary Examiner* — Matthew Smithers
*Assistant Examiner* — Nelson Giddins
(74) *Attorney, Agent, or Firm* — Moffat & Co.

(57) **ABSTRACT**

A method, device and system for establishing plural modes of operation on a mobile device, including: associating each application on the mobile device with one of a plurality of modes; and restricting access to data on the mobile device to only a subset of applications based on the mode associated for the each application. A system includes connection of an untrusted device to a trusted device and restricting data access for restricted data to a subset of trusted applications on the untrusted device.

**15 Claims, 6 Drawing Sheets**



## US 9,147,085 B2

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,052,735 | A | 4/2000 | Ulrich et al. |
| 6,105,132 | A | 8/2000 | Fritch et al. |
| 6,233,446 | B1 | 5/2001 | Do |
| 6,292,798 | B1 | 9/2001 | Dockter et al. |
| 6,351,816 | B1 | 2/2002 | Mueller et al. |
| 6,360,322 | B1 | 3/2002 | Grawrock |
| 6,405,202 | B1 | 6/2002 | Britton et al. |
| 6,412,070 | B1 | 6/2002 | Van Dyke et al. |
| 6,516,421 | B1 | 2/2003 | Peters |
| 6,647,388 | B2 | 11/2003 | Numao et al. |
| 6,668,323 | B1 | 12/2003 | Challener et al. |
| 6,757,821 | B1 | 6/2004 | Akiyama et al. |
| 6,772,350 | B1 | 8/2004 | Belani et al. |
| 6,795,967 | B1 | 9/2004 | Evans et al. |
| 6,886,038 | B1* | 4/2005 | Tabbara et al. ............... 709/223 |
| 6,957,330 | B1 | 10/2005 | Hughes |
| 6,978,385 | B1 | 12/2005 | Cheston et al. |
| 7,246,374 | B1* | 7/2007 | Simon et al. .................... 726/16 |
| 7,331,058 | B1 | 2/2008 | Gladney |
| 7,373,657 | B2* | 5/2008 | Walker ............................... 726/4 |
| 7,400,878 | B2 | 7/2008 | Hassan et al. |
| 7,555,723 | B1* | 6/2009 | Coe ................................. 715/769 |
| 7,574,200 | B2 | 8/2009 | Hassan et al. |
| 7,694,328 | B2* | 4/2010 | Joshi et al. ........................ 726/2 |
| 7,869,789 | B2 | 1/2011 | Hassan et al. |
| 7,917,963 | B2* | 3/2011 | Goyal et al. .................... 726/29 |
| 8,001,375 | B2* | 8/2011 | Hattori et al. ................ 713/165 |
| 8,005,507 | B2* | 8/2011 | Celik ............................. 455/557 |
| 8,074,078 | B2 | 12/2011 | Brown et al. |
| 8,095,124 | B2* | 1/2012 | Balia ............................. 455/418 |
| 8,204,480 | B1* | 6/2012 | Lindteigen et al. .......... 455/411 |
| 8,205,257 | B1* | 6/2012 | Satish et al. .................... 726/22 |
| 8,244,279 | B2* | 8/2012 | Dicke et al. .................. 455/457 |
| 8,275,356 | B2* | 9/2012 | Hickie ........................... 455/410 |
| 8,370,929 | B1* | 2/2013 | Pennington et al. ........... 726/22 |
| 2001/0047485 | A1 | 11/2001 | Brown et al. |
| 2002/0013815 | A1* | 1/2002 | Obradovich et al. ......... 709/204 |
| 2002/0019944 | A1 | 2/2002 | Kou |
| 2002/0031230 | A1 | 3/2002 | Sweet et al. |
| 2002/0095414 | A1 | 7/2002 | Barnett et al. |
| 2002/0095497 | A1 | 7/2002 | Satagopan et al. |
| 2002/0112155 | A1 | 8/2002 | Martherus et al. |
| 2003/0005317 | A1 | 1/2003 | Audebert et al. |
| 2003/0061482 | A1* | 3/2003 | Emmerichs ................... 713/165 |
| 2003/0065676 | A1* | 4/2003 | Gbadegesin et al. ...... 707/104.1 |
| 2003/0093698 | A1 | 5/2003 | Challener et al. |
| 2003/0120948 | A1 | 6/2003 | Schmidt et al. |
| 2003/0126437 | A1 | 7/2003 | Wheeler et al. |
| 2003/0163685 | A1 | 8/2003 | Paatero |
| 2003/0177389 | A1 | 9/2003 | Albert et al. ................. 713/201 |
| 2004/0001101 | A1 | 1/2004 | Trajkovic et al. |
| 2004/0111360 | A1* | 6/2004 | Albanese ........................ 705/38 |
| 2005/0091309 | A1* | 4/2005 | Bookman et al. ............. 709/203 |
| 2005/0154935 | A1 | 7/2005 | Jin |
| 2005/0210270 | A1 | 9/2005 | Rohatgi et al. |
| 2005/0213763 | A1* | 9/2005 | Owen et al. .................... 380/42 |
| 2005/0223239 | A1* | 10/2005 | Dotan ............................ 713/188 |
| 2006/0059556 | A1 | 3/2006 | Royer |
| 2006/0070114 | A1 | 3/2006 | Wood et al. |
| 2006/0129948 | A1 | 6/2006 | Hamzy et al. |
| 2006/0156026 | A1 | 7/2006 | Utin |
| 2006/0212589 | A1 | 9/2006 | Hayer et al. |
| 2006/0212925 | A1* | 9/2006 | Shull et al. ...................... 726/1 |
| 2006/0212945 | A1* | 9/2006 | Donlin et al. .................. 726/29 |
| 2006/0236126 | A1* | 10/2006 | Adams et al. ................. 713/193 |
| 2006/0253894 | A1* | 11/2006 | Bookman et al. ............... 726/2 |
| 2006/0294102 | A1* | 12/2006 | Reddish et al. ................. 707/9 |
| 2007/0073694 | A1 | 3/2007 | Picault et al. |
| 2007/0186275 | A1* | 8/2007 | Shahbazi ......................... 726/2 |
| 2007/0226778 | A1* | 9/2007 | Pietruszka ....................... 726/2 |
| 2007/0277127 | A1 | 11/2007 | Carlson et al. |
| 2008/0081609 | A1* | 4/2008 | Burgan et al. ................. 455/425 |
| 2008/0104572 | A1* | 5/2008 | Hernandez et al. ........... 717/114 |
| 2008/0222711 | A1* | 9/2008 | Michaelis .......................... 726/7 |
| 2008/0254767 | A1* | 10/2008 | Jin .................................. 455/411 |

| | | | |
|---|---|---|---|
| 2008/0282093 | A1* | 11/2008 | Hatakeyama ................. 713/190 |
| 2009/0024992 | A1* | 1/2009 | Kulaga et al. ................. 717/177 |
| 2009/0049510 | A1* | 2/2009 | Zhang et al. ...................... 726/1 |
| 2009/0049518 | A1* | 2/2009 | Roman et al. .................... 726/1 |
| 2009/0254753 | A1* | 10/2009 | De Atley et al. ............. 713/176 |
| 2009/0271583 | A1* | 10/2009 | Kershaw et al. .............. 711/163 |
| 2010/0031325 | A1* | 2/2010 | Maigne et al. ................... 726/4 |
| 2010/0050244 | A1* | 2/2010 | Tarkhanyan et al. ............ 726/7 |
| 2010/0057911 | A1* | 3/2010 | Soppet et al. ................ 709/226 |
| 2010/0093379 | A1* | 4/2010 | Neely et al. ................... 455/466 |
| 2010/0175104 | A1* | 7/2010 | Khalid .............................. 726/1 |
| 2010/0241610 | A1* | 9/2010 | Gibson et al. ................. 706/54 |
| 2010/0293576 | A1* | 11/2010 | Batchu et al. ................. 707/955 |
| 2010/0306528 | A1* | 12/2010 | Andress et al. .............. 713/153 |
| 2010/0319053 | A1* | 12/2010 | Gharabally .................... 726/4 |
| 2011/0055917 | A1* | 3/2011 | Wickstrom .................... 726/17 |
| 2011/0099643 | A1* | 4/2011 | Harvey et al. ................. 726/30 |
| 2011/0107437 | A1* | 5/2011 | Goyal et al. .................... 726/30 |
| 2011/0145833 | A1* | 6/2011 | De Los Reyes et al. ...... 718/106 |
| 2011/0167470 | A1* | 7/2011 | Walker et al. .................... 726/1 |
| 2011/0246566 | A1* | 10/2011 | Kashef et al. ................. 709/203 |
| 2011/0276806 | A1* | 11/2011 | Casper et al. ................. 713/189 |
| 2011/0277038 | A1* | 11/2011 | Sahita et al. .................. 726/27 |
| 2011/0314467 | A1* | 12/2011 | Pearson .......................... 718/1 |
| 2012/0014321 | A1* | 1/2012 | Schmitz ...................... 370/328 |
| 2012/0023573 | A1* | 1/2012 | Shi ................................. 726/17 |
| 2012/0054853 | A1* | 3/2012 | Gupta et al. .................. 726/17 |
| 2012/0079609 | A1* | 3/2012 | Bender et al. ................. 726/30 |
| 2012/0131685 | A1* | 5/2012 | Broch et al. ................... 726/30 |
| 2012/0202527 | A1* | 8/2012 | Obradovich et al. ...... 455/456.3 |
| 2012/0311282 | A1* | 12/2012 | Cannon et al. ................ 711/162 |
| 2013/0217378 | A1* | 8/2013 | Danford et al. ............... 455/419 |
| 2013/0298185 | A1* | 11/2013 | Koneru et al. ................... 726/1 |
| 2013/0305058 | A1* | 11/2013 | Kapoor et al. ................ 713/189 |
| 2014/0108793 | A1* | 4/2014 | Barton et al. ................. 713/165 |
| 2014/0115709 | A1* | 4/2014 | Gross et al. .................... 726/26 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| GB | 2408179 | 5/2005 |
| WO | 0059225 | 10/2000 |
| WO | 2005045550 A2 | 5/2005 |
| WO | 2009014975 | 1/2009 |

OTHER PUBLICATIONS

EP Application No. 12155659.1, Extended European Search Report dated Jan. 8, 2012.

Smartphone Security Beyond Lock and Wipe (Jun. 10, 2010): http://www.enterprisemobiletoday.com/article.php/3887006.

Basic Access Authentication (Jan. 23, 2010): http://en.wikipedia.org/wiki/Basic_access_authentication.

Digital Access Authentication (Dec. 23, 2009): http://en.wikipedia.org/wiki/Digest_access_authentication.

Cross-site request forgery (Nov. 30, 2008): http://en.wikipedia.org/wiki/Cross-site_request_forgery.

Extended European Search Report mailed Jul. 13, 2012 , in corresponding European patent application No. 12153439.0.

"Customizing User Interaction in Smart Phones", Pervasive Computing, IEEE CS (2006) pp. 81-90 (URL: http://www.idi.ntnu.no/grupper/su/bibliography/pdf/2006/Korpipaa2006pc.pdf).

"Supporting Mobile Privacy and Security through Sensor-Based Context Detection", Julian Seifert, Second International Workshop on Security and Privacy in Spontaneous Interaction and Mobile Phone Use, May 17, 2010, Finland (URL: http://www.medien.ifi.lmu.de/iwssi2010/papers/iwssi-spmu2010-seifert.pdf).

U.S. Appl. No. 10/524,353, office action dated Sep. 21, 2012.

Owen, Russell N., U.S. Appl. No. 10/524,353, filed Feb. 14, 2005; Title: System and Method for Secure Control of Resources of Wireless Mobile Communication Device.

Bender, Christopher Lyle; U.S. Appl. No. 13/074,136, filed Mar. 29, 2011; Title: Data Source Based Application Sandboxing.

International Application No. PCT/CA 03/01245, International Search Report dated Dec. 23, 2003.

**US 9,147,085 B2**

Page 3

(56) **References Cited**

OTHER PUBLICATIONS

International Application No. PCT/CA 03/01245, PCT Written Opinion, dated Apr. 23, 2004.
International Application No. PCT/CA 03/01245, PCT Written Opinion, dated Sep. 20, 2004.
International Application No. PCT/CA 03/01245, PCT International Preliminary Examination Report, dated Nov. 29, 2004.
Owen, Russell N., U.S. Appl. No. 13/371,093, filed Feb. 10, 2012; Title: System and Method for Secure Control of Resources of Wireless Mobile Communication Device.

Owen, Russell N., U.S. Appl. No. 10/524,353, filed Aug. 19, 2003; Title: System and Method for Secure Control of Resources of Wireless Mobile Communication Devices.
Canadian Intellectual Property Office, Office Action, App No. 2814852, Dec. 9, 2014.
International Searching Authority, International Search Report, Application No. PCT/CA2011/001058, Dec. 21, 2011.
International Preliminary Searching Authority, International Preliminary Report on Patentability, Application No. PCT/CA2011/001058, Jan. 7, 2013.

* cited by examiner



**FIG. 1**



FIG. 2



FIG. 3



**FIG. 4**

Case 2:24-cv-00905   Document 1-1   Filed 11/06/24   Page 9 of 17 PageID #:  27



FIG. 5



FIG. 6

US 9,147,085 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## METHOD FOR ESTABLISHING A PLURALITY OF MODES OF OPERATION ON A MOBILE DEVICE

### RELATED APPLICATIONS

The present application claims priority from U.S. provisional application Ser. No. 61/386,270 filed on Sep. 24, 2010, the complete drawings and specification of which are incorporated herein by reference.

### FIELD OF THE DISCLOSURE

The present disclosure relates to mobile devices and in particular to data and application security on computing devices.

### BACKGROUND

Mobile devices are used for a variety of purposes. Users may wish to use the device for personal applications such as games, really simple syndication (RSS) reading, web browsing and general leisure. Corporations may want a device to be used for a subset of functionality required for a user to complete their job.

However, when a mobile device is used for both corporate and personal matters, a corporation may choose to limit the risk of exposure of data on the mobile device. This may be done, for example, through information technology (IT) policies with regard to the device. Such policies sometimes lead to a poor user experience for the device as the device is locked or restricted regarding which applications can be loaded onto the device. For example, an IT policy on the device may want to prevent potential viruses, and thus the user may be prohibited from downloading software from any location other than a specifically approved location. This limits the range of applications that the user can install.

### BRIEF DESCRIPTION OF THE DRAWINGS

The present disclosure will be better understood with reference to the drawings in which:

FIG. 1 is a block diagram showing application and data memory on a mobile device;

FIG. 2 is a system architecture diagram for a mobile device;

FIG. 3 is a block diagram showing the connection of a corporate device to a personal device;

FIG. 4 is a flow diagram showing an example method in accordance with the present disclosure;

FIG. 5 is a block diagram showing an example computing device; and

FIG. 6 is a block diagram showing an example mobile device capable of being used with the present disclosure.

### DETAILED DESCRIPTION

The present disclosure provides for a method of establishing plural modes of operation on a mobile device, the method comprising: associating each application on the mobile device with one of a plurality of modes; and restricting access to data on the mobile device to only a subset of applications based on the mode associated with the application.

The present application further provides a mobile device configured for plural modes of operation, the mobile device comprising: a processor; and memory, wherein the processor and memory cooperate to: associate each application on the mobile device with one of a plurality of modes; and restrict

access to data on the mobile device to only a subset of applications based on the mode associated with the application.

The present disclosure further provides a system comprising: a trusted device configured to receive restricted data, the trusted device having: a processor; memory; wherein the processor and memory cooperate to: associate each application on the trusted device with one of a plurality of modes; and restrict access to data on the trusted device to only a subset of applications based on the designated mode for the application; the trusted device further including server software; and an untrusted device, the untrusted device having: a processor; memory; wherein the untrusted device processor and memory cooperate to: associate a subset of applications on the untrusted device as associated with a trusted mode; the untrusted device further having a client capable of communicating with the server on the trusted device, wherein the client restricts access to the restricted data on the trusted device to the subset of applications on the untrusted device belonging to the trusted mode.

Rather than restricting access to an entire device that is used for both personal and corporate functionality, the present disclosure provides for the creation of a dual or plural mode of operations on the device. In particular, the present disclosure segregates applications into one of a plurality of groups. In the example of corporate and personal, applications can be designated as either corporate or personal applications. In some cases, where an application may be both corporate and personal, a copy of the application can be provided in both the personal space and the corporate space on the mobile device.

The present disclosure provides for a mobile device, but is not meant to be limited to any particular mobile device. Examples of mobile devices can include smart phones, personal digital assistants, data enabled cellular telephones, tablet computers, among others.

The mobile device in the present disclosure implements an information technology policy to control corporate data. This may be done by connection to an enterprise server, which provides for the IT policy for the device. In other embodiments, the IT policy may be implemented on a per device basis individually.

Reference is now made to FIG. 1, which shows a block diagram of the memory 110 of a mobile device. The memory is configured to store applications and application data, such combination of stored applications and data being referred to herein as an application space. The memory 110 is divided into a personal space 120 and a corporate space 130 in the example of FIG. 1.

Corporate space 130 generally comprises a portion of memory on the mobile device segregated for data, applications, or both, which may be considered sensitive to a business, corporation, enterprise, government, non-profit organization, a user of the device or any other entity setting an information technology policy for the computing device.

Personal space 120 generally comprises a portion of memory segregated for "personal" applications and data, where such applications or data may be considered outside of or separate from an information technology policy.

Within personal space 120, a plurality of applications 122 can communicate with data 124 that is considered to be personal data.

Similarly, in corporate space 130, a plurality of corporate applications 132 communicate with corporate data 134.

By segregating corporate applications from personal applications and data associated with each, corporate IT policies can be implemented on the device for the corporate data, thereby protecting the data, while still allowing for personal

US 9,147,085 B2

**3**

applications and personal data on the device. This provides for more flexibility for a user and a better user experience.

Operating system **140** enforces the segregation of the data as described in more detail below.

The designation of each application as either a personal application or a corporate application may be done in several ways. In one embodiment, a corporate IT policy can be set for the loading of applications onto the device, where certain specified applications are designated by the IT policy to be corporate applications. Other applications that are not within the list of corporate applications could be considered, by default, to be personal applications. In other embodiments, a user, administrator, carrier or other entity can use a configuration program or a navigation entity (application launcher) to designate the various applications on the device as personal or corporate applications. Further, signatures applied to applications could also be used for the designation. Other examples of the designation of applications as corporate and personal would be apparent to those skilled in the art having the benefit of the present disclosure.

In further embodiments, hybrid applications that might have both personal and corporate uses could be duplicated between the corporate space **130** and the personal space **120**. In this way, if a user wants to use a particular application for personal reasons, the user could open the application **122** in the personal space. Conversely, if the user wants to use the same application for corporate purposes, the user could open the application **132** in corporate space **130**.

Thus, for example, a Documents To Go™ document editor could be provided for both the personal space and the corporate space, thereby allowing the editing of both personal documents and corporate documents, while maintaining security for corporate data.

In one embodiment, corporate applications **132** could be provided with additional security over personal applications. For example, before a corporate application **132** could be launched, the user may need to enter a password. Further, inactivity timers could be implemented to lock corporate applications after a period of inactivity while leaving personal applications unlocked. A locked application may require a user to initially enter a password to unlock the application and interact with and access data from the application.

The designation of the application may further limit what data that application has access to. Thus, for example, corporate applications may run in their own mode where any data that they write can never be accessed by the personal application. The limitation would be that personal applications **122** are not able to read corporate data **134**, nor is a corporate application capable of writing to personal data **124**.

Similarly, a personal application may not be able to write to corporate data **134**. In some embodiments, corporate applications **132** may not be able to read personal data **124**. In other embodiments, corporate applications **132** may be able to read personal data **124**.

Corporate data **134** may be encrypted for security. Such encryption and the storing of encryption keys would be known to those in the art having the benefit of the present disclosure.

Corporate data may also have date of deletion policies in effect on the mobile device. Thus, if corporate data is not accessed within a certain time period, it could be wiped out pursuant to a corporate data reaping timeline. For example, if data is not accessed on the mobile or computing device for seven days, the data may be deleted from the mobile device. The user would then need to download the data again if it was required for the mobile device. This may be implemented through tags or data tables associated with the data.

**4**

The operating system **140** can enforce the above differentiating rules between corporate space **130** and personal space **120**. For example, operating system **140** may implement data access for the various applications **122** and **132**, where each application is given a group permission, similar to UNIX group permissions. In other embodiments, other user permission or other permission system may also be used. Data is further designated in files that allow access by certain groups. Thus, operating system **140** may allow corporate data **134** to be accessed only by applications **132** that have group permissions to access such data. Similarly, personal data **124** may be written to or read only by applications **122** based on the group permissions of application **122** with regard to data **124**. Applications **132** however do not have group permissions to write to data **124** in one embodiment, as enforced by operating system **140**.

As shown by the dotted arrow in FIG. **1**, data **124** may have some form of public permissions that would allow applications **132** to read the data **124**.

Access to the data may be maintained for other data functionalities to prevent corporate data from being accessed in the personal mode. For example, copy or cut functionality may be managed between the personal mode and corporate mode. Potentially, no cutting or copying would be allowed in the corporate mode of operation by corporate applications **132**.

In other embodiments, cutting and copying may be allowed between corporate applications but may be restricted when trying to paste outside corporate mode. As will be appreciated, this could again be managed by UNIX group permission type model using operating system **140**. When cutting or copying various text or images, or other data, a new data file is created which could have group permissions that would restrict where the pasting of that file is allowed to occur. Thus, when using a personal application, if trying to paste corporate data, an error might be returned, or the paste operation may simply not function.

In one embodiment, corporate data **134** may be provided to a device based on a secure connection with the corporate network. For example, this may be done through a virtual private network or other secure connection to an enterprise server.

Further, in one embodiment, the memory **110** may be located on a mobile device. In this case, the mobile device may have a pre-established secure connection with an enterprise server.

One system architecture which provides secure access to an enterprise server is shown with regard to FIG. **2**. The architecture of FIG. **2** is however not meant to be limiting and other system architectures are possible.

Reference is now made to FIG. **2**, which shows a block diagram of an example wireless data network in accordance with the present disclosure and with which the various embodiments of the methods of the instant disclosure may cooperate. FIG. **2** shows a block diagram of a mobile device **210** and example Code Division Multiple Access (CDMA) 1x network **220**, an example Evolution Data Only (EVDO) network **230**, a public switched telephone network (PSTN) **235**, a data network **240**, wireless gateway **242** and enterprise server **244**. This is shown merely as an example, and other network architectures, such as Global System for Mobile (GSM), GSM Packet Radio Service (GPRS), Universal Mobile Telecommunications Service (UMTS), Long Term Evolution (LTE), LTE Advanced (LTE-A), High Speed Downlink Packet Access (HSDPA), WiFi, WiMAX, among others, are possible.

5

The mobile device **210** may comprise a two-way communication device having data and voice communication capabilities. FIG. **2** further shows an access point **270** for use with an alternative data connection such as a WiFi or WiMAX connection.

CDMA network **220** is comprised of a base transceiver station (BTS) **222** and a base station controller (BSC) **224**. Base station controller **224** communicates with a mobile switching centre **226** which, as will be appreciated, is a circuit switched only component communicating with PSTN **235**. Base station controller **224** further communicates with a packet data serving node (PDSN) **228** which is a packet switched only component. PDSN **228** further communicates with IP network **240**.

EVDO network **230** contains an EVDO sector **232** which communicates with access node (AN) **234**. Since the EVDO network **230** is a data only network, access node **234** communicates only with PDSN **228** and not with any circuit switch components.

An authentication, authorization and accounting node **236** is associated with AN **234**, and a similar node **229** is associated with PDSN **228**.

Operationally, mobile device **210** communicates wirelessly with CDMA network **220** using BTS **222** and BSC **224** to gain access to the CDMA 1x network.

Mobile device **210** sends and receives both data and voice services through CDMA network **220** until an EVDO network connection with established, at which point data can be transmitted over the EVDO network connection.

Further, mobile device **210** can be connected to a computing device **254** such as a tablet for a variety of reasons, some of which are provided below. The connection may be through various means such as a Universal Serial Bus (USB) or other serial port, or by short range wireless communications with a computing device **254**. Computing device **254** can then gain access to data network **240** and to enterprise server **244** through EVDO network **230** or CDMA network **220** using mobile device **210**.

Mobile device **210** may further have capabilities to communicate through access point **270** using, for example, WiFi. Access point **270** connects to a data network **240** and thus access to wireless gateway **242** and enterprise server **244** are possible through access point **270**

In one embodiment, enterprise server **244** could provide both the IT policies for the mobile device **210** and also provide access to a permanent store of the corporate data which can be accessed by mobile device **210**.

As will be appreciated by those skilled in the art having the benefit of the present disclosure, the embodiment of FIG. **2** is merely an example and other networks models are possible for mobile device **210** to connect to enterprise server **244**. The embodiment of FIG. **2** is not meant to be limiting to any particular network architecture.

Further, mobile device **210** may not be a dual mode or multi mode device that allows connection to WiFi. In this case, the WiFi connection to access point **270** would be removed from the embodiment of FIG. **2** and all communication may proceed over the cellular network through the base station **222** or **232**. In other embodiments, mobile device **210** may only have access through an access point **270** and thus the cellular network would be removed from FIG. **2**. Other possibilities would be apparent to those skilled in the art having the benefit of the present disclosure.

Computing device **254**, may, in some embodiments, comprise a personal computing device. For example, computing device **254** may comprise a tablet computer. The user may further wish to use computing device **254** for corporate func-

6

tions. However, for security reasons, the corporate IT department may not consider the computing device **254** to be a secure destination for data, since it is a personal device.

In order to overcome this, one solution would be to connect the non-secure computing device **254** to the secure (IT trusted) mobile device **210**. Reference is now made to FIG. **3**.

In FIG. **3**, the secure device is mobile device **210**. However, this is merely an example and other possibilities for secure mobile devices exist.

The unsecured computing device is computing device **254**.

In order to run corporate data on computing device **254**, a client **310** may be provided on the computing device **254**. Client **310** communicates with a server **320** on the secure mobile device **210** to obtain corporate data.

Further, the computing device **254** may include memory **330**, which has a corporate space **334** for storing corporate applications that may be run on computing device **254**. Computing device **254** may also have a personal space **332** within memory **330**.

As seen in the example of FIG. **3**, the personal space contains applications **332** which may access data **336**. However, in some embodiments no similar data exists for corporate applications **334**.

In an alternative embodiment, corporate space **334** could have data **338** which could be regulated by the same corporate policies as data **348** on mobile device **210**. Thus, data **338** would be subject to access restrictions to corporate applications, garbage collection, restrictions on copying or cutting, among the other restrictions provided above. The client **310** could provide this functionality.

On mobile device **210** the divided modes are similarly provided. In particular, memory **340** contains personal applications **342** and corporate applications **344**. This is similar to the embodiments described above with regard to FIG. **1**.

Each of personal application space **332** and corporate application space **334** has access to a separate data area, namely data **346** for personal applications **342** and data **348** for corporate applications **344**. In this way, data **348** cannot be accessed by personal applications **342**.

In an alternative embodiment, mobile device **210** may be considered to be a corporate device. In this case, application space **340** would only have corporate applications **344** and corporate data **348**. Thus, all information stored on mobile device **210** would be considered to be corporate data, and be accessible only by corporate applications **334**.

In order to provide security, a user of computing device **254** may start an application as a corporate application **334**. As indicated above, a password may be required to start such applications.

Client **310** recognizes that a corporate application **334** is running and can communicate with server **320** to indicate that corporate data can be provided. In this way server **320** can access the corporate data that is either in data storage **348** or the corporate data can be obtained from an enterprise sever as described above with regard to FIG. **2**.

As will be appreciated by those in the art having the benefit of the present disclosure, corporate applications **344** do not necessarily have to be the same as corporate applications **334**. For example, with a larger display, computing device **254** may be able to run different applications or variations of applications **344**. The corporate data **348** may be the same between the two sets of applications, but could be displayed to the user or used by corporate applications **334** differently than the data **348** would be used on mobile device **210**.

The corporate data may then be provided over a connection **360** between mobile device **210** and computing device **254**. As will be appreciated by those in the art having the benefit of

**7**

the present disclosure, connection **360** may comprise any short or long range wired or wireless connection, and examples of such connections include Bluetooth™, USB, Infrared Data Assn (IrDA), WiFi, Radio-frequency identification (RFID), Near Field Communication (NFC) connections, among others.

Communication over link **360** can be secure. That is, corporate data that is passed to computing device **254** or back to mobile device **210** may be encrypted using a key known to both computing device **254** and mobile device **210**.

Further, in one embodiment any data that is stored is encrypted. In this case, the encryption key for the stored data may be stored on mobile device **210**, thus necessitating the connection in order to decrypt the data on the computing device **254**.

Further, it may be a policy that the data is not stored on computing device **254**. Thus, except for some possible caching, corporate data will not be stored on device **254**. Further, client **310** can ensure that the cache is cleared prior to the corporate application shutting down.

In some embodiments, trusted system components such as navigators to navigate through applications, notification applications, among others will be able to display data from both the corporate and personal sides, giving a merged user interface experience. For example, operating system **140** in FIG. **1** is trusted and given special privileges. Hence, the operating system **140** is able to access both corporate and personal data and merge the data sources into a single display for the user.

From a user interface prospective, corporate applications and personal applications may be distinguished through various means. For example, in a cover flow style user interface, various panes can be designated as personal panes which house personal applications and corporate panes which house corporate applications. The screen color could be different for the two applications. In other embodiments, different fonts could be used for corporate applications or personal applications, or different colors or other delineations could be used to distinguish between corporate applications and personal applications.

While the above is described with regard to a corporate and a personal space, the number of modes or spaces for applications can be further refined. For example, a corporation may consider sales and other information to be more sensitive than employee information. In this regard, sales and such information may be given a separate category from employee information and may be provided with different data storage and segregation, different passwords for the applications that run and display sales information, among other factors. In this case, three modes would exist—personal, corporate employees, and corporate sales.

Further, the above could be expanded to have a plurality of different modes or application spaces with each one being separated and access to each of the plurality of application spaces and the data associated therewith governed by the operating system. The present disclosure is not meant to be limited to any particular number of modes.

FIG. **4** provides a flow diagram showing a method to designate each application as being in one of a plurality of modes and restricting data access for each application based on the mode of the application. Specifically, FIG. **4** provides a flow chart which starts at block **410** and proceeds to block **420**. In block **420** a mobile device designates each application as being in one of a plurality of modes.

The process then proceeds to block **430** in which data access is restricted for applications based on the designated mode of the application.

**8**

The process then proceeds to block **440** and ends.

Reference is now made to FIG. **5**, which shows a simplified diagram of a computing device **254**. Computing device **254** may comprise a tablet, mobile device, personal computer, laptop computer, among others. The embodiment of FIG. **5** is however not meant to be limiting and other devices could be used.

Computing device **254** generally includes a processor **538**, which controls the overall operation of the device. Processor **538** interacts with device subsystems such as the display **522**, memory **524**, auxiliary input/output (I/O) subsystems **528**, serial port **530**, one or more keyboards or keypads **532**, where keyboard or keypad **532** may comprise a physical keyboard or a virtual keyboard or both, one or more speakers **534**, microphone **536**, other communication subsystem **540** such as a short-range communications subsystem, including Bluetooth and near field communications, and any other device subsystems generally designated as **542**. Serial port **530** could include a USB port or other port.

Memory **524** may be segregated as illustrated in FIGS. **1** and **3**, described above. Operating system software used by the processor **538** may be stored in memory **524**. The operating system, specific device applications, or parts thereof, may be temporarily loaded into a volatile memory such as RAM **526**.

Applications may be loaded onto the device and associated with a mode. Such applications and data for the application may be stored in memory associated with the mode.

In some embodiments, computing device **254** may optionally include a communications subsystem **511** capable of communication with a data access point. Such data access point may include a cellular network or WiFi or WiMAX network, among others. In further embodiments, computing device **254** may be capable of voice communications.

Similarly, in one embodiment, device **210** could be a mobile device. One such example mobile device is illustrated below with reference to FIG. **6**. The mobile device of FIG. **6** is however not meant to be limiting and other mobile devices could also be used.

Mobile device **600** may comprise a two-way wireless communication device having any of voice capabilities, data communication capabilities, or both. Mobile device **600** generally has the capability to communicate with other devices or computer systems. Depending on the exact functionality provided, the mobile device may be referred to as a data messaging device, a two-way pager, a wireless e-mail device, a cellular telephone with data messaging capabilities, a wireless Internet appliance, a wireless device, a user equipment, a tablet, or a data communication device, as examples.

Where mobile device **600** is enabled for two-way communication, it may incorporate a communication subsystem **611**, including both a receiver **612** and a transmitter **614**, as well as associated components such as one or more antenna elements **616** and **618**, local oscillators (LOs) **613**, and a processing module such as a digital signal processor (DSP) **620**. As will be apparent to those skilled in the field of communications, the particular design of the communication subsystem **611** will be dependent upon the communication network in which the device is intended to operate.

Network access requirements will also vary depending upon the type of network **619**. In some networks, network access is associated with a subscriber or user of mobile device **600**. A mobile device may require a removable user identity module (RUIM) or a subscriber identity module (SIM) card in order to operate on the network. The SIM/RUIM interface **644** may be similar to a card-slot into which a SIM/RUIM card can be inserted and ejected like a diskette or PCMCIA

US 9,147,085 B2

**9**

card. The SIM/RUIM card can have memory and hold many key configuration **651**, and other information **653** such as identification, and subscriber related information.

When required network registration or activation procedures have been completed, mobile device **600** may send and receive communication signals over the network **619**. As illustrated in FIG. **6**, network **619** can consist of multiple base stations communicating with the mobile device. For example, in a hybrid CDMA 1x EVDO system, a CDMA base station and an EVDO base station communicate with the mobile station and the mobile device is connected to both simultaneously. In other systems such as Long Term Evolution (LTE) or Long Term Evolution Advanced (LTE-A), multiple base stations may be connected to for increased data throughput. Other systems such as GSM, GPRS, UMTS, HSDPA, among others are possible and the present disclosure is not limited to any particular cellular technology.

Signals received by antenna **616** through communication network **619** are input to receiver **612**, which may perform such common receiver functions as signal amplification, frequency down conversion, filtering, channel selection and the like, and in the example system shown in FIG. **6**, analog to digital (A/D) conversion. A/D conversion of a received signal allows more complex communication functions such as demodulation and decoding to be performed in the DSP **620**. In a similar manner, signals to be transmitted are processed, including modulation and encoding for example, by DSP **620** and input to transmitter **614** for digital to analog conversion, frequency up conversion, filtering, amplification and transmission over the communication network **619** via antenna **618**. DSP **620** not only processes communication signals, but also provides for receiver and transmitter control. For example, the gains applied to communication signals in receiver **612** and transmitter **614** may be adaptively controlled through automatic gain control algorithms implemented in DSP **620**.

Mobile device **600** generally includes a processor **638** which controls the overall operation of the device. Communication functions, including data and voice communications, are performed through communication subsystem **611**. Processor **638** also interacts with further device subsystems such as the display **622**, flash memory **624**, random access memory (RAM) **626**, auxiliary input/output (I/O) subsystems **628**, serial port **630**, one or more keyboards or keypads **632**, speaker **634**, microphone **636**, other communication subsystem **640** such as a short-range communications subsystem and any other device subsystems generally designated as **642**. Serial port **630** could include a USB port or other port known to those in the art having the benefit of the present disclosure.

Some of the subsystems shown in FIG. **6** perform communication-related functions, whereas other subsystems may provide "resident" or on-device functions. Notably, some subsystems, such as keyboard **632** and display **622**, for example, may be used for both communication-related functions, such as entering a text message for transmission over a communication network, and device-resident functions such as a calculator or task list, among other applications.

Operating system software used by the processor **638** may be stored in a persistent store such as flash memory **624**, which may instead be a read-only memory (ROM) or similar storage element (not shown). Those skilled in the art will appreciate that the operating system, specific device applications, or parts thereof, may be temporarily loaded into a volatile memory such as RAM **626**. Received communication signals may also be stored in RAM **626**.

As shown, flash memory **624** can be segregated into different areas for both computer programs **658** and program

**10**

data storage **650**, **652**, **654** and **656**. These different storage types indicate that each program can allocate a portion of flash memory **624** for their own data storage requirements. The applications may be segregated based on the mode or category they fall into. Memory **624** may further provide security for corporate data and if some applications are locked while others are not.

Processor **638**, in addition to its operating system functions, may enable execution of software applications on the mobile device. A predetermined set of applications that control basic operations, including data or voice communication applications for example, will normally be installed on mobile device **600** during manufacturing. Other applications could be installed subsequently or dynamically.

Applications and software, such as those described above with regard to FIGS. **1** and **3** may be stored on any computer readable storage medium. The computer readable storage medium may be a tangible or intransitory/non-transitory medium such as optical (e.g., CD, DVD, etc.), magnetic (e.g., tape) or other memory known in the art.

One example software application may be a personal information manager (PIM) application having the ability to organize and manage data items relating to the user of the mobile device such as, but not limited to, e-mail, calendar events, voice mails, appointments, and task items. Further applications, including, but not limited to, a media player, camera, messenger, mail, calendar, address book, web browser, social networking, game, electronic book reader, map, or other application may also be loaded onto the mobile device **600** through the network **619**, an auxiliary I/O subsystem **628**, serial port **630**, short-range communications subsystem **640** or any other suitable subsystem **642**, and installed by a user in the RAM **626** or a non-volatile store (not shown) for execution by the processor **638**. Such flexibility in application installation increases the functionality of the device and may provide enhanced on-device functions, communication-related functions, or both. For example, secure communication applications may enable electronic commerce functions and other such financial transactions to be performed using the mobile device **600**.

In a data communication mode, a received signal such as a text message or web page download will be processed by the communication subsystem **611** and input to the processor **638**, which may further process the received signal for output to the display **622**, or alternatively to an auxiliary I/O device **628**.

A user of mobile device **600** may also compose data items such as email messages for example, using a keyboard **632**, which may comprise a virtual or physical keyboard or both, and may include a complete alphanumeric keyboard or telephone-type keypad, among others, in conjunction with the display **622** and possibly an auxiliary I/O device **628**. Such composed items may then be transmitted over a communication network through the communication subsystem **611**.

For voice communications, overall operation of mobile device **600** is similar, except that received signals would typically be output to one or more speakers **634** and signals for transmission would be generated by a microphone **636**. Alternative voice or audio I/O subsystems, such as a voice message recording subsystem, may also be implemented on mobile device **600**. Although voice or audio signal output may be accomplished primarily through the one or more speakers **634**, display **622** may also be used to provide an indication of the identity of a calling party, the duration of a voice call, or other voice call related information for example.

Serial port **630** in FIG. **6** would normally be implemented in a personal digital assistant (PDA)-type mobile device for

US 9,147,085 B2

11

which synchronization with a user's desktop computer (not shown) may be desirable, but is an optional device component. Such a port **630** would enable a user to set preferences through an external device or software application and would extend the capabilities of mobile device **600** by providing for information or software downloads to mobile device **600** other than through a wireless communication network. The alternate download path may for example be used to load an encryption key onto the device through a direct and thus reliable and trusted connection to thereby enable secure device communication. As will be appreciated by those skilled in the art, serial port **630** can further be used to connect the mobile device to a computer to act as a modem.

Other communications subsystems **640**, such as a short-range communications subsystem, are further optional components which may provide for communication between mobile device **600** and different systems or devices, which need not necessarily be similar devices. For example, the subsystem **640** may include an infrared device and associated circuits and components, near field communications (NFC) or a Bluetooth™ communication module to provide for communication with similarly enabled systems and devices.

The embodiments described herein are examples of structures, systems or methods having elements corresponding to elements of the techniques of this application. This written description may enable those skilled in the art to make and use embodiments having alternative elements that likewise correspond to the elements of the techniques of this application. The intended scope of the techniques of this application thus includes other structures, systems or methods that do not differ from the techniques of this application as described herein, and further includes other structures, systems or methods with insubstantial differences from the techniques of this application as described herein.

The invention claimed is:

**1**. A method of establishing plural modes of operation on a mobile device, the method comprising:
  associating each application on the mobile device with one of a plurality of modes; and
  restricting data on the mobile device to be accessible by only a subset of applications based on the mode associated with the application,
  wherein the data is associated with one of the plurality of modes and the restricting comprises adding a group permission to the data and providing each application with access to the data based on the group permission, the group permission for data associated with one of the plurality of modes controls access to the data by applications associated with the others of the plurality of modes, and the group permission for the data limits the ability to copy a subset of the data between modes, where some data can be copied directly between modes, and
  wherein data associated with the first mode is deleted from the mobile device when such data is not accessed within a time period, while data associated with the second mode does not have a deletion policy.

**2**. The method of claim **1**, wherein the modes comprise a personal mode and a corporate mode.

**3**. The method of claim **1**, wherein the data associated with one of the plurality of modes is encrypted.

**4**. The method of claim **1**, wherein applications in one of the plurality of modes implement access restrictions.

**5**. The method of claim **4**, wherein the access restrictions include a password requirement to start the applications in the one of the plurality of modes.

12

**6**. A mobile device configured for plural modes of operation, the mobile device comprising:
  a processor; and
  memory,
  wherein the processor and memory cooperate to:
  associate each application on the mobile device with one of a plurality of modes; and
  restrict data on the mobile device to be accessible by only a subset of applications based on the mode associated with the application,
  wherein the data is associated with one of the plurality of modes and the restricting comprises adding a group permission to the data and providing each application with access to the data based on the group permission, the group permission for data associated with one of the plurality of modes controls access to the data by applications associated with the others of the plurality of modes, and the group permission for the data limits the ability to copy a subset of the data between modes, where some data can be copied directly between modes, and
  wherein data associated with the first mode is deleted from the mobile device when such data is not accessed within a time period, while data associated with the second mode does not have a deletion policy.

**7**. The mobile device of claim **6**, wherein the modes comprise a personal mode and a corporate mode.

**8**. The mobile device of claim **6**, wherein the data associated with one of the plurality of modes is encrypted.

**9**. The mobile device of claim **6**, wherein applications in one of the plurality of modes implement access restrictions.

**10**. The mobile device of claim **9**, wherein the access restrictions include a password requirement to start the applications in the one of the plurality of modes.

**11**. A non-transitory computer readable medium for storing program instructions, which when executed by a processor of a mobile device are configured to:
  associate each application on the mobile device with one of a plurality of modes; and
  restrict data on the mobile device to be accessible by only a subset of applications based on the mode associated with the application,
  wherein the data is associated with one of the plurality of modes and the restricting comprises adding a group permission to the data and providing each application with access to the data based on the group permission, the group permission for data associated with one of the plurality of modes controls access to the data by applications associated with the others of the plurality of modes, and the group permission for the data limits the ability to copy a subset of the data between modes, where some data can be copied directly between modes, and
  wherein data associated with the first mode is deleted from the mobile device when such data is not accessed within a time period, while data associated with the second mode does not have a deletion policy.

**12**. The non-transitory computer readable medium of claim **11**, wherein the modes comprise a personal mode and a corporate mode.

**13**. The non-transitory computer readable medium of claim **11**, wherein the data associated with one of the plurality of modes is encrypted.

**14**. The non-transitory computer readable medium of claim **11**, wherein applications in one of the plurality of modes implement access restrictions.

US 9,147,085 B2

**13**

**14**

**15**. The non-transitory computer readable medium of claim **14**, wherein the access restrictions include a password requirement to start the applications in the one of the plurality of modes.

\* \* \* \* \*